**Counsel of Record:**
**Judson T. Mihok**
**Gregory R. Bockin**
**Joseph G. Sansone**
**Julia C. Green**
**SECURITIES AND EXCHANGE COMMISSION**
**Philadelphia Regional Office**
**1617 JFK Boulevard, Suite 520**
**Philadelphia, PA 19103**
**Phone: 215-597-6500**
**Fax: 215-597-2740**
**Email: MihokJ@sec.gov**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| JOEL DAVID CASTRO LEON and SHMUEL A. SHERR, | |
| Defendants. | |

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission"), One Penn Center, 1617 JFK Boulevard, Suite 520, Philadelphia, Pennsylvania 19103, files this Complaint against Defendants Joel David Castro Leon ("Leon"), whose last known address is Diskin 1, Jerusalem, Israel, and Shmuel A. Sherr, whose last known address is 37 Sderot Ben Tsvi, Israel, both of whom are also c/o Steven Y. Yurowitz, YurowitzLaw PLLC, 950 Third Avenue, 31st Floor, New York, NY 10022, and alleges as follows:

## SUMMARY OF THE ACTION

1. From at least July 2020 through May 2021 (the "Relevant Period"), Leon and Sherr engaged in a fraudulent market manipulation scheme known as "spoofing," where Leon used Sherr's brokerage accounts to manipulate the prices of approximately 50 stocks and generate approximately $415,090 in ill-gotten gains for them to share.

2. Leon was the primary architect of the scheme and conducted all of the trading at issue in Sherr's brokerage accounts with Sherr's permission.

3. Leon traded in Sherr's accounts because multiple brokerage companies had closed Leon's accounts, and thus Leon was unable to trade in his own name. Instead, Leon recruited Sherr to open brokerage accounts so that Leon could trade.

4. Sherr agreed to assist Leon, opened two brokerage accounts in his own name, and granted Leon access to those accounts without disclosing to the brokerage companies ("Brokerage Company A" and "Brokerage Company B") that Leon would be conducting the trading.

5. Leon's manipulative trading strategy allowed him to buy certain stocks at artificially low prices and immediately sell them at artificially high prices.

6. Specifically, Leon, using Sherr's accounts, placed multiple non-bona fide *sell* orders for certain stocks that he did not intend to actually execute while simultaneously or shortly thereafter placing bona fide buy orders that he did intend to have executed. The purpose of the non-bona fide sell orders was to lower the stock's price by creating a false appearance of selling interest or activity in the stock and to induce other market participants to execute against Leon's bona fide buy orders at artificially depressed prices (*i.e.*, "buy low"). Once Leon bought the stock at artificially low prices, he canceled his open non-bona fide sell orders.

7.      After establishing this position, Leon manipulated the market once again so he could fully capitalize on his "buy low, sell high" strategy. He placed multiple non-bona fide *buy* orders while simultaneously or shortly thereafter placing bona fide *sell* orders for the same stock he had just purchased. Leon's non-bona fide buy orders created the false appearance of buying interest or activity, which artificially inflated the price of the stock, and induced other traders to execute against his bona fide sell orders at artificially inflated prices.

8.      Leon and Sherr agreed to share the trading profits 90% to Leon and 10% to Sherr. Together, they used the manipulative trading scheme described herein to reap $373,581 in ill-gotten gains for Leon and $41,509 in ill-gotten gains for Sherr.

9.      Their scheme came to an end because both brokerage companies terminated Sherr's accounts and Brokerage Company B, in particular, terminated his account after twice identifying and confronting Sherr with examples of manipulative trading in his account.

10.     While Leon conducted all of the trading, he would not have been able to do so without Sherr's knowledge and assistance. Sherr knew Leon was unable to trade in his own name, yet Sherr allowed Leon to trade in Sherr's account at Brokerage Company B even after he was confronted twice about the manipulative trading activities in his account.

11.     By engaging in the spoofing scheme and as alleged further in this Complaint, Leon violated, and unless enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)], and Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (c)].

12.     By engaging in the spoofing scheme and as alleged further in this Complaint, Sherr violated, and unless enjoined will continue to violate, Sections 17(a)(1) and (3) of the

Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (c)], and aided and abetted Leon's violation of Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

## JURISDICTION AND VENUE

13. The Commission brings this action, and this Court has subject matter jurisdiction over this action, pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Leon and Sherr, directly or indirectly, made use of the mails, or the means and instrumentalities of interstate commerce, or the facilities of national securities exchanges, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

14. Venue is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §§ 78aa] because certain of the acts, practices, transactions and courses of business constituting the alleged violations occurred within the District of New Jersey.

## DEFENDANTS

15. **Joel David Castro Leon**, age 41, is a resident of Jerusalem, Israel. He is currently unemployed and has never held any securities licenses.

16. **Shmuel A. Sherr**, age 34, is a resident of Jerusalem, Israel. He is a student and massage therapist and has never held any securities licenses.

## TERMS USED IN THIS COMPLAINT

17. The term *spoofing* refers to a type of market manipulation scheme that involves placing non-bona fide orders to create a false appearance of new or increased trading interest in a particular security and is intended to induce market participants to place orders priced at or better than the spoofer's non-bona fide orders. This conduct creates artificial market conditions that benefit the spoofer's interests while harming other market participants.

18. The term *thinly traded* securities refers to stocks that have low trading volume and do not trade often. As compared to more actively traded securities with greater trading volume, thinly traded stocks often have few interested buyers and sellers and tend to be more volatile because just a handful of trades can affect their market prices substantially.

19. The term *national best bid* ("NBB") means the highest price a buyer is willing to pay to buy a security. The term *national best offer* ("NBO") means the lowest price that a seller is willing to accept to sell a security. Collectively, the NBB and NBO are referred to as the "NBBO."

20. The term *limit order* refers to an order to buy or sell a security at a specific price or better. A buy limit order can only be executed at the limit price or lower, and a sell limit order can only be executed at the limit price or higher. A limit order is not guaranteed to execute. A limit order can only be executed if the stock's market price reaches the limit price. While limit orders do not guarantee execution, they help ensure that an investor does not pay more than a pre-determined price for a stock.

21. The term *market order* refers to an order to buy or sell a security immediately. This type of order guarantees that the order will be executed, but does not guarantee the

execution price.  A market order will execute at or near the NBB (for a sell order) or NBO (for a buy order).

## FACTS

**A.      Leon's Former Brokerage Firms Terminated His Trading Privileges.**

22.     Leon previously owned brokerage accounts in his name and was able to trade in them.

23.     By the end of 2016, at least four brokerage companies where Leon owned accounts unilaterally terminated his accounts.

**B.      Leon Recruited Sherr.**

24.     Leon met Sherr through a mutual friend in their Jerusalem neighborhood.

25.     After they became friends, Leon approached Sherr with a proposal: because Leon's brokerage accounts had been terminated and he was unable to trade in his own name, Leon asked Sherr to open brokerage accounts in Sherr's name so that Leon could use those brokerage accounts to trade stock.

26.     Sherr agreed to this arrangement and the two agreed that they would share the trading profits 90% to Leon and 10% to Sherr.

27.     In accordance with their agreement, Sherr opened accounts at Brokerage Company A and Brokerage Company B on April 26, 2020 and May 5, 2020, respectively, and provided Leon with the login credentials so that Leon could trade in Sherr's accounts.

28.     Sherr granted Leon access to those accounts without disclosing to the brokerage companies that Leon would be conducting the trading, despite, for example, telling Brokerage Company B that no one other than Sherr had trading authority over the account.

**C.  Leon Used Sherr's Accounts to Engage in Manipulative Trading.**

29. On an almost daily basis during the Relevant Period, Leon, using Sherr's accounts, carried out the spoofing scheme by manipulating the NBBO of certain stocks.

30. Leon's spoofing strategy typically manipulated the prices of thinly traded stocks, which are easier to manipulate due to their low trading volume.

31. For example, Leon placed non-bona fide limit sell orders visible to other market participants that established new NBOs – incrementally narrowing the NBBO from the offer side – to allow him to buy a security at an artificially low price. Leon then purchased the security via a market order.

32. After buying the security at the artificially low price, Leon canceled his visible sell orders.

33. Then Leon repeated his spoofing from the buy side of the market to pump up the price of the same security he had just purchased. Specifically, Leon placed a series of visible, non-bona fide limit buy orders that established a new NBB and walked the price of the security up to a price point where he could sell the security for a quick profit.

34. Below is an example of Leon using Sherr's account to spoof the sell side of a particular security, Phathom Pharmaceutical, Inc. ("PHAT") stock, on November 4, 2020:



35. In this example, the grey area is the NBBO for PHAT stock. The spread for the NBBO at 10:16 a.m. was a NBB of $41.00 per share and a NBO of $41.75 per share.

36. From 10:17 a.m. through 10:21 a.m., Leon placed eight non-bona fide, visible, limit sell orders ranging from 100 to 900 shares from Sherr's account to lower the NBO (as indicated by the eight orange lines).

37. Each of these non-bona fide limit sell orders lowered the NBO.

38. Leon canceled six of these orders within seconds only to replace them with a lower limit sell order until the NBO was lowered to $40.50 per share at 10:21 a.m., at which time he executed five market orders to cumulatively buy almost 2,000 shares of PHAT stock below $40.10 per share (as indicated by the green plus signs).

39. Leon continued his spoofing several more times within the next twenty minutes to depress the NBO even further, culminating with six market orders to buy approximately an additional 3,000 shares of PHAT stock below $39.40 per share, to accumulate a total of approximately 5,000 shares by 10:40 a.m.

40. Leon then canceled the remaining non-bona fide limit sell orders and spoofed the buy side to walk up the price of the NBB so he could sell the PHAT stock at artificially higher prices, as demonstrated in the below graph.



41. To increase the likelihood that the NBB for PHAT stock would stay at a price point higher than the price at which he had just purchased the stock, Leon placed two non-bona fide, visible, limit buy orders for 1,300 shares each that increased the NBB (as indicated by the green lines).

42. Once the NBB rebounded to $41.00 at 10:54 a.m., which was the price point for the stock before Leon began his manipulation, Leon began selling via market orders all 5,000 PHAT shares he had acquired earlier (as indicated by the orange plus signs). He executed these market sell orders at price points between $41.00 per share and $41.44 per share.

43. Thus, within 50 minutes, Leon engaged in spoofing that enabled him to buy a stock at artificially low prices and then repeated the process to enable him to sell the same stock at artificially high prices.

44. Leon used Sherr's accounts to engage in this manipulative trading scheme and generate approximately $6,604 in just 50 minutes. This example is just one of many instances of spoofing activity.

D. **Leon and Sherr Ignored Admonishments to Cease Spoofing.**

45. Leon placed hundreds of manipulative orders while trading in Sherr's brokerage accounts.

46. Leon placed so many non-bona fide orders that Brokerage Company A terminated Sherr's account on May 26, 2020, just thirty days after it had been opened.

47. Leon, pretending to be Sherr, called Brokerage Company A to withdraw the funds as soon as possible so he could use them to trade elsewhere – specifically Brokerage Company B, where Sherr had already opened an account on May 5, 2020 at Leon's instruction.

48. On November 10, 2020, Brokerage Company B placed a trading restriction on Sherr's account after identifying suspicious trading.

49. Sherr and Leon agreed that Sherr would call Brokerage Company B to remove the restriction because Sherr believed Brokerage Company B's voice recognition system would not recognize Leon's voice as the account holder. Leon instructed Sherr on how to explain the suspicious trading so that Brokerage Company B would lift the trading restriction.

50. On November 10, 2020, Sherr called Brokerage Company B and asked that the restriction be removed from his account. A representative from Brokerage Company B told Sherr that the trading in his account was improper and could be considered manipulative. The representative instructed Sherr to immediately cease trading in the manner identified.

51. Sherr misrepresented to the Brokerage Company B representative that he was the person who performed the trades at issue. He further stated, at Leon's direction, that he would comply with the instructions, and the restriction was lifted.

52. But Sherr continued to grant Leon access to his account, and Leon continued the spoofing scheme.

53. On April 22, 2021, Brokerage Company B confronted Sherr again after detecting more manipulative trading in Sherr's account. Leon again coached Sherr on how to respond to avoid a trading restriction.

54. Brokerage Company B eventually terminated the account's trading privileges on June 28, 2021.

**E.    Leon and Sherr Profited Over $415,000 From Their Manipulative Trading.**

55. In total, Leon used Sherr's accounts to engage in manipulative trading in approximately 50 securities over at least a ten-month period.

56. Their scheme generated illicit profits of at least approximately $415,090, with 90% (approximately $373,581) going to Leon and the remaining 10% (approximately $41,509) going to Sherr.

**FIRST CLAIM FOR RELIEF**
**Fraud in Violation of Sections 17(a)(1) and (3) of the Securities Act**
**(Against Both Defendants)**

57. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 56, inclusive, as if they were fully set forth herein.

58. By virtue of the foregoing, Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities, and by the use of the means of instruments of transportation or communication in interstate commerce or the mails:

   a. Knowingly or recklessly employed one or more devices, schemes or artifices to defraud; and

   b. Knowingly, recklessly, or negligently engaged in one or more transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

59. By virtue of the foregoing, Defendants violated and, unless restrained and enjoined, will again violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

**SECOND CLAIM FOR RELIEF**
**Fraud in Violation of Section 10(b) of the Exchange Act and**
**Rules 10b-5(a) and (c) thereunder**
**(Against Both Defendants)**

60. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 56, inclusive, as if they were fully set forth herein.

61. By virtue of the foregoing, Defendants directly or indirectly, singly or in concert, in connection with the purchase or sale of a security, by use of the means or instruments of interstate commerce, or of the mails, or the facilities of a national securities exchange, knowingly or recklessly:

    a. Employed one or more devices, schemes, or artifices to defraud; and

    b. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

62. By virtue of the foregoing, Defendants violated and, unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a), (c)] thereunder.

### THIRD CLAIM FOR RELIEF
### Violation of Section 9(a)(2) of the Exchange Act
### (Against Leon)

63. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 56, inclusive, as if they were fully set forth herein.

64. By virtue of the foregoing, Leon, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

65. By reason of the foregoing, Leon violated and, unless enjoined, will again violate Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violation of Section 9(a)(2) of the Exchange Act
### (Against Sherr)

66. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 56, inclusive, as if they were fully set forth herein.

67. By virtue of the foregoing, Sherr knowingly provided substantial assistance to Leon, who directly or indirectly, by the use of the mails or means or instrumentalities of interstate commerce, or of a facility of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in securities creating actual or apparent active trading in such securities, or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others.

68. By reason of the foregoing, Sherr aided and abetted Leon's violations of, and unless enjoined, will again aid and abet violations of, Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Leon and Sherr and their agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from, directly or indirectly, engaging in conduct in violation of the federal securities laws alleged in this Complaint;

**II.**

Ordering Defendants to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received, directly or indirectly, as a result of the conduct alleged in this Complaint, pursuant to Section 21(d)(3), (5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5) and (7)];

**III.**

Ordering Leon and Sherr to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**IV.**

Enjoining Leon, for a period of five years, from, directly or indirectly, opening, maintaining or trading in any brokerage account(s) in his name, the names of any immediate family members, the names of any company over which he has any control or the names of any third party individual(s), without providing the relevant broker-dealer(s) a copy of the complaint and final judgment entered against him in this action, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and (5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) & (5)];

**V.**

Enjoining Sherr, for a period of three years, from, directly or indirectly, opening, maintaining or trading in any brokerage account(s) in his name, the names of any immediate family members, the names of any company over which he has any control or the names of any third party individual(s), without providing the relevant broker-dealer(s) a copy of the complaint and final judgment entered against him in this action, pursuant to Section 20(b) of the Securities

Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and (5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) & (5)]; and

## VI.

Granting such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried before a jury.

Respectfully submitted,

Date: September 17, 2024

/s/*Judson T. Mihok*
Judson T. Mihok
Gregory R. Bockin
Joseph G. Sansone
Julia C. Green
Attorneys for Plaintiff:
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
215-597-3100 (phone)
215-597-2740 (fax)
MihokJ@sec.gov

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged against the Defendants in the foregoing Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceeding.

Date: September 17, 2024                          Respectfully submitted,

*/s/Judson T. Mihok*
Judson T. Mihok
Gregory R. Bockin
Joseph G. Sansone
Julia C. Green
Attorneys for Plaintiff:
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
215-597-3100 (phone)
215-597-2740 (fax)
MihokJ@sec.gov

Counsel of Record:
Judson T. Mihok
Gregory R. Bockin
Joseph G. Sansone
Julia C. Green
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Phone: 215-597-65003100 (phone)
Fax: 215-597-2740
Email: MihokJ@sec.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : <br> : <br> : |
| Plaintiff, | : Civil Action No. _____ <br> : <br> : **DESIGNATION OF AGENT FOR** |
| v. | : **SERVICE** <br> : |
| JOEL DAVID CASTRO LEON and SHMUEL A. SHERR, | : <br> : <br> : |
| Defendants. | : <br> : |

Pursuant to Local Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the captioned action. Therefore, service upon the United States or its authorized designee, David Dauenheimer, Deputy Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102 shall constitute Service upon the Commission for purposes of this action.

| | |
|---|---|
| Date:  September 17, 2024 | /s/*Judson T. Mihok* <br> Judson T. Mihok <br> Gregory R. Bockin <br> Joseph G. Sansone <br> Julia C. Green <br> Attorneys for Plaintiff: <br> SECURITIES AND EXCHANGE COMMISSION <br> Philadelphia Regional Office <br> 1617 JFK Boulevard, Suite 520 <br> Philadelphia, PA  19103 <br> Phone: 215-597-6500 <br> Fax: 215-597-2740 <br> Email: MihokJ@sec.gov |